

**U.S. Department of Justice**

*United States Attorney's Office
District of Delaware*

*Nemours Building*            *(302) 573-6277*
*1007 Orange Street, Suite 700*    *FAX (302) 573-6220*
*P.O. Box 2046*
*Wilmington, Delaware 19899-2046*

May 2, 2008

<u>VIA ECF</u>

The Honorable Joseph J. Farnan, Jr.
United States District Judge
District of Delaware
844 King Street
Wilmington, DE 19801

     Re:    **United States v. Stanley D. Lum**
              **Criminal Action No.  07-103-JJF**

Dear Judge Farnan:

     This letter concerns the defendant's Motion to Suppress Physical Evidence and Statements (D.I. 12) ("Initial Motion"), as well as his Supplemental Motion to Suppress Physical Evidence and Statements (D.I. 24) ("Supplemental Motion").  On April 18, 2008, the Court held an evidentiary hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).  At the end of the hearing, defense counsel made clear that the only two suppression issues pending before the Court were whether or not:  (1) Wilmington Police Department ("WPD") officers exceeded the scope of the search warrant by seizing controlled substances and drug paraphernalia in the defendant's bedroom; and (2) the search warrant for 3001 N. Madison Street is invalid under the <u>Franks</u> doctrine.  The Government submits that the record shows that each of these questions should be answered in the negative. Accordingly, both of the defendant's motions should be denied.

     **A.**      **The Search of 3001 N. Madison Street Did Not Exceed the Scope of the Warrant.**

     In the Initial Motion, the defendant asserts that the drug and drug paraphernalia seizures at 3001 N. Madison Street exceeded the scope of the search warrant since those items were not specifically listed in the warrant itself.  Init. Mot. (D.I. 12) ¶ 14.  In particular, at the evidentiary hearing, defense counsel clarified that his issue was "whether or not the case law would support the

seizure of, for example, the controlled substance where the scope of the warrant was limited to a gun, pictures of the male resident, and the body of Mr. Lum for a photograph." Transcripts ("Tr.") at 45.[1]

Third Circuit case law is clear that an officer, while executing a search warrant, may seize contraband that is found in plain view, even if it is not specifically listed in the warrant itself. E.g., United States v. Menon, 24 F.3d 550, 559-60 (3d Cir. 1994) (stating that "[t]he Supreme Court has allowed officers to seize incriminating evidence in plain view during the course of a lawful search because such a seizure 'does not involve an intrusion on privacy. If the interest in privacy has been invaded, the violation must have occurred before the object came into plain view.'") (quoting Horton v. California, 496 U.S. 128, 141 (1990)). Of course, this assumes that the officers were searching in a location that was within the scope of the warrant. Id. For example, as the Court pointed out, officers could not lawfully seize contraband found in a medicine cabinet if the warrant only authorized them to search for the body of the defendant. Tr. at 45-46. That is not the case here, however.

The warrant for 3001 N. Madison Street authorized WPD officers to search for a number of items, including ammunition for a .40 caliber firearm or a piece of identification. Def. Ex. 1 (Search Warrant) at 00000010. The defendant does not dispute that the cocaine base and drug paraphernalia were discovered by WPD officers in a dresser drawer and jacket pocket in the defendant's bedroom. A bullet for a .40 caliber firearm or a piece of identification could have been found in either one of these locations. Accordingly, since the officers in question had a right to search in those areas, they could likewise seize any evidence that was obvious contraband, such as the crack cocaine and drug paraphernalia in question, even if it was not specifically listed on the face of the warrant. See United States v. Gamble, 388 F.3d 74, 77 (2d Cir. 2004) (holding that the plain view doctrine authorized law enforcement officers executing a valid warrant to seize an ammunition clip found in plain view in a dresser drawer "because they had a warrant authorizing them to search for and seize cocaine and drug paraphernalia – items that could plausibly be found in a dresser drawer").

**B.    The Defendant Has Not Met His Burden To Establish a <u>Franks</u> Violation.**

To establish a Franks violation, the defendant has the burden to establish by the preponderance of the evidence that: (1) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for the warrant; and (2) such statements or omissions were material, or necessary, to the probable cause determination. United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006). The Government respectfully asserts that the defendant has not met his burden with regard to either one of these elements.

---

[1] The transcripts of the evidentiary hearing are attached in their entirety.

1.      There Are No False Statements in the Warrant Affidavit That Were Made Knowingly and Deliberately, or With a Reckless Disregard for Truth.

At the evidentiary hearing, the defendant only identified one misstatement in the search warrant affidavit – namely, that a witness at the scene said that he overheard the suspected shooter say to another individual "stop hanging [out] in front of my mom's house." Tr. at 15; Def. Ex. 1 at 00000011, ¶ 3. In fact, the witness in question had said that the shooter referred to the house in question as being the shooter's "aunt's" house, not his "mom's" house. Tr. at 15; Gov. Ex. 1 (Pigford 7/31/07 Report) at 00000096, ¶ 2. Instead, it was the victim in the case who, during an interview later that day, said that the shooter referred to 3001 N. Madison as his "mom's" house. Tr. at 15 & 32; Def. Ex. 1 at 00000011, ¶ 6.; Gov. Ex. 1 at 00000096, ¶ 3.

Under the <u>Franks</u> doctrine, for a misstatement to be made "knowingly and deliberately," or with a "reckless disregard for truth," the defendant must establish – at the very least – that the officer had "obvious reasons to doubt the truth of what he or she [was] asserting." <u>Yusuf</u>, 461 F.3d at 383 (quoting <u>Wilson v. Russo</u>, 212 F.3d 781, 783 (3d Cir. 2000)). The misstatement described above was not made under such circumstances. Officer Pigford interviewed the witness to the shooting at around 5 a.m. on June 30, 2007. Tr. at 28. He interviewed the victim of the shooting approximately twelve hours later. <u>Id.</u> The two individuals gave similar versions of the events that transpired that morning. Def. Ex. 1 at 00000011, ¶¶ 3 & 6; Gov. Ex. 1 at 00000096, ¶¶ 2 & 3. The only real difference between the two statements was that the witness thought he heard the shooter make reference to his "aunt's house" and the victim thought he heard the shooter refer to his "mom's house." Def. Ex. 1 at 00000011, ¶¶ 3 & 6; Gov. Ex. 1 at 00000096, ¶¶ 2 & 3. Since Detective Pigford spoke with the victim immediately prior to writing the search warrant affidavit, at that time he mistakenly recalled both witnesses as stating that the shooter referred to his "mom's house." Tr. at 15 & 32. This was plainly not an attempt to mislead the magistrate; rather, it was a simple mistake.[2] Misstatements that involve "negligence or innocent mistake" do not amount to a <u>Franks</u> violation. <u>Yusuf</u>, 461 F.3d at 383.

2.      There Are No Omissions in the Warrant Affidavit that Were Made Knowingly and Deliberately, or with a Reckless Disregard for Truth.

With regard to any alleged omissions in a warrant affidavit, the Third Circuit has concluded that "omissions are made with reckless disregard for the truth when an officer recklessly omits facts that *any reasonable person* would want to know." <u>Yusuf</u>, 461 F.3d at 383 (emphasis supplied); <u>see also</u> <u>Russo</u>, 212 F.3d at 787 ("We cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip."). The only alleged omission that is identified in the defendant's Supplemental

---

[2] Indeed, if Detective Pigford had deliberately intended to mislead the magistrate, it is difficult to understand why he would create evidence of the supposed deception in his own report. Gov. Ex. 1 at 00000096, ¶ 2 (Detective Pigford indicating in his own report that the witness at the scene said that the shooter referred to his "aunt's" house).

Motion is that "the suspect [sic] told them the individual who shot him was a light-skinned, black male about 5'7", 120 lbs."  Supp. Mot. (D.I. 24) ¶ 3(d).

As Detective Pigford testified at the evidentiary hearing, the witness described the shooter as a light-skinned, black male who was about 5'7" and 120 lbs.  Tr. at 16.  However, as Detective Pigford recorded in his notes, the witness also said that he could not identify the shooter.  Id. at 34; Def. Ex. 4 (Pigford Notes of Witness Statement) at 00000046 ("cannot ID").  Accordingly, Detective Pigford did not plan on using this witness to identify the suspect.  Tr. at 34.  Rather, he relied on the victim's description of the shooter, since he indicated that he could make an identification.  Tr. at 17, 34-35; Def. Ex. 1 at 00000011, ¶ 6; Def. Ex. 5 at 00000046; Gov. Ex. 1 at 00000096, ¶ 3.  Accordingly, when these circumstances are considered, it is certainly not the case that "any reasonable person" would want to know how the witness described the shooter, particularly when that description is only slightly different than that given by the victim.  Compare Def. Ex. 5 at 00000046 (victim describing the shooter as a light brown black male, in his 20's, 5'6" to 5'8" and 140 to 150 lbs) with Def. Ex. 4 at 000000 (witness describing shooter as light skin male, in his 20's, about 5'7" and 120 lbs).[3]

---

[3]  At the evidentiary hearing, the defendant questioned Detective Pigford with regard to two other alleged omissions, despite the fact that they were not mentioned in his Supplemental Motion.

The first alleged omission is that the shooter fled the scene in a vehicle.  As Detective Pigford testified, prior to completing the affidavit, he did not receive any information – not from the witness, not from the victim, and not from Officer Kavanaugh – that the shooter fled the scene in a vehicle. Tr. 20-22.  Indeed, neither his handwritten notes nor his report describe the shooting suspect fleeing in a vehicle.  Gov. Ex. 5 at 00000096; Def. Ex. 4 at 00000046; Def. Ex. 5 at 00000048-49. Therefore, assuming that the shooter did in fact flee in a vehicle, this information was not within Detective Pigford's ken prior to authoring the affidavit.  As such, it cannot be information that he either deliberately or recklessly omitted from the affidavit.  Wilson, 212 F.3d at 788 (holding that a fact is recklessly omitted from an affidavit under Franks if an "officer withholds a fact in his ken" that any reasonable person would wish to know) (emphasis supplied).

The defendant also questioned Detective Pigford as to why, when he was writing the affidavit, he did not mention the fact that the defendant last used the phone number 302.762.7917 in 2003.  As Detective Pigford testified, he initially discovered the phone number by cross-referencing addresses, names and phone numbers in public records. Tr. at 24-25.  This records check yielded information that both Stanley Lum and his mother, Renee Payne, were residing at the 3001 N. Madison Street address.  Tr. at 25; Def. Ex. 1 at 00000011, ¶ 7.  The 302.762.7917 number is mentioned in the affidavit to give the magistrate background as to how Detective Pigford was initially able to make this connection.  Def. Ex. 1 at 00000011, ¶ 7; Tr. at 25-26.  Indeed, the material fact yielded by Detective Pigford's research was not the phone number, but that Stanley Lum and his mother were the only two individuals listed as living at 3001 N. Madison Street – the residence identified by the victim as being connected with the shooter and his mother.  Def. Ex. 1 at 00000011,
(continued...)

3.    Taking All of the Defendant's Allegations as True, the "Corrected" Affidavit Would Still Support Probable Cause for a Search of 3001 N. Madison Street.

As the Court is aware, a search warrant is supported by probable cause if the affidavit attached thereto establishes, in light of the totality of the circumstances, that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Under the Franks doctrine, in order to vitiate the warrant, any misstatements or omissions must be necessary to this probable cause determination.    Yusuf, 461 F.3d at 383.  Therefore, while the Government submits that the defendant has not established by a preponderance of the evidence that Detective Pigford made any knowing or reckless misstatements in the affidavit, the defendant has failed to meet his burden under Franks for an entirely separate reason:  if the Court were to "correct" the affidavit to account for the any of the alleged misrepresentations or omissions, it would still contain probable cause to search 3001 N. Madison Street.  Id. at 383-84.

As described in the affidavit, a shooting victim[4] stated that the mother of his assailant lived at 3001 N. Madison Street, a location with a wheelchair ramp outside. Def. Ex. 1 ¶ 6.  The victim also gave a description of the shooter and indicated that he had seen the shooter in front of this residence in the past.  Id.  Through his investigation, Detective Pigford discovered that only two people were listed as living at 3001 N. Madison Street – Renee Payne, a handicapped individual, and her son Stanley Lum, who generally fit the description of the shooter given by the victim.  Id. Accordingly, with these facts in mind, there was at least a fair probability that the shooter was the defendant, and that his residence was 3001 N. Madison Street.  Since it is reasonable to infer that an individual's personal effects would be kept at his residence, there is also a fair probability that the .40 caliber firearm, any ammunition thereto, and the defendant's identification would be located at that address. E.g., United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993).   In like manner, the final category of materials sought  – any picture, identification, mail, papers, or other materials

_____

[3](...continued)
¶¶ 6-7. Accordingly, the phone number itself has little, if any, relevance to the affidavit other than to connect the dots in Detective Pigford's investigation.  In this context, whether or not that phone number was used after 2003 (by Lum, or for that matter, his mother), is not a fact that "any reasonable person" would want to know when determining whether there was probable cause to search the residence in question.

[4] Information given by identified informants, such as the victim, are afforded greater weight than that given by anonymous informants.  See United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000) (describing the rationale for affording a face-to-face informant more credibility than an anonymous informant); see also Gates,462 U.S. at 233-34 (indicating that "if an unquestionably honest citizen comes forward with a report of criminal activity which if fabricated would subject him to criminal liability  we have found rigorous scrutiny of the basis of his knowledge unnecessary.").

related to the possible identity of the owner's children – are personal effects that an individual, in this case Ms. Payne, would likely keep in her home.

In light of the foregoing reasons, the Government respectfully asserts that the defendant's Initial and Supplemental Motions should be denied.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY:    __/s/ Shawn A. Weede_____
Shawn A. Weede
Assistant United States Attorney

cc:    Edson A. Bostic, Esq.

# ATTACHMENT A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, )
                          )
          Plaintiff,      )
                          ) Civil Action No. 07-103-JJF
v.                        )
                          )
STANLEY DELANO LUM,       )
                          )
          Defendant.      )


                    Friday, April 18, 2008
                    2:00 p.m.
                    Courtroom 4B


                    844 King Street
                    Wilmington, Delaware


BEFORE:   THE HONORABLE JOSEPH J. FARNAN, JR.
          United States District Court Judge


APPEARANCES:


          UNITED STATES ATTORNEY'S OFFICE
          BY:  SHAWN WEEDE, ESQ.

                    Counsel for Plaintiff


          PUBLIC DEFENDERS OFFICE
          BY:  EDSON A. BOSTIC, ESQ.

                    Counsel for Defendant

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

2

1                 THE COURT:  Be seated, please.

2    Good afternoon.

3                 MR. WEEDE:  Good afternoon, Your

4    Honor.  Shawn Weede for the government.  Now is

5    the time the Court has set for an evidentiary

6    hearing in the matter of United States versus

7    Stanley Lum, 07-103-JJF.

8                 The defendant is in the courtroom,

9    Your Honor, with his counsel, Mr. Bostic.  Your

10   Honor, before we proceed with the hearing, may

11   we at least speak briefly as to the scope of the

12   hearing?

13               THE COURT:  Sure.

14              MR. WEEDE:  Your Honor, I have

15   read the Court's order scheduling the

16   evidentiary hearing for today and the way I read

17   it, I don't see the Court has made a explicit

18   Franks finding, namely that the defendant has

19   made a substantial preliminary showing that

20   there is a material misstatement in the

21   affidavit that was made so either deliberately

22   or recklessly.

23               And just for the record, Your

24   Honor, I would at this point object to a Franks

3

1    proceeding based on the motion that the

2    defendant has submitted in this case.  To be

3    frank, Your Honor, I reviewed the motion and am

4    still somewhat at a loss as to exactly which

5    misstatements or omissions the defendant is

6    proceeding on, how those misstatements or

7    omissions are material that is necessary for

8    probable cause or for that matter were made

9    deliberately or recklessly.

10            I think under the case law it's

11    fairly clear that the defendant must actually

12    specifically identify those statements; must

13    make an order of proof as to how they're

14    material to the affidavit and do that by either

15    supporting evidence or an explanation why

16    evidence was not presented.

17            So Your Honor, just for the

18    record, I would note that objection.  And if the

19    Court is inclined to proceed with the Franks

20    hearing, that at least the government have some

21    offer of proof or notice from the defense as to

22    what exactly its arguments are before we simply

23    put Detective Pigford on the stand.

24            Thank you, Your Honor.

4

1           THE COURT:  All right.  Thank you.

2           MR. BOSTIC:  Your Honor, may I?

3           THE COURT:  Yes.

4           MR. BOSTIC:  Thank you.

5           Your Honor, I discussed this

6   matter with Mr. Lum last time we were in Court

7   and subsequent in terms of the supplemental

8   motion.  And I'll start by saying he feels very

9   strongly that there are misstatements in the

10  warrant affidavit that either were intentionally

11  made or made with reckless disregard for what

12  the facts were in this case, and that they are

13  substantial.

14          And to the extent that the police

15  paperwork contains different versions of the

16  information the officers got here, some of which

17  makes it into the warrant affidavit and some of

18  which does not, we felt it was appropriate that

19  we enclose the entire subset of discovery that

20  dealt with the issue, but the point of some of

21  the factors that we believe are important, we

22  talk about in the supplemental motion the fact

23  that supposedly the shooting victim indicated

24  that the subject involved in the shooting, that

5

1    it occurred in front of the person's mother's

2    house, which would be 3001 North Madison Street.

3                We note that in some of the

4    affidavit -- the discovery submitted to the

5    Court, it appears that there was a statement to

6    the contrary, that it was a person's aunt's

7    house.  And to tell the -- to be honest with the

8    Court, from my perception, there is more likely

9    to be probable cause based upon if it's at a

10   person's mother's house that you would expect

11   the person would from time to time congregate

12   inside that house or may even be living there as

13   opposed to it's a relative.

14                And we think that's material.  And

15   we don't know which is which because they're

16   both in the police report.

17                In addition, there is a

18   description given by what appears to be the

19   shooting victim in this case which describes the

20   individual as a light skinned black male, 5'7",

21   and we note that the warrant affidavit describes

22   the individual as 5'8", I believe, 140 to 155

23   pounds.

24                Now, again, you have both in the

1       the discovery, and they're conflicting.  And we

2       don't know which is which because there is no

3       identifiers that you can say well, officer X got

4       this and officer Y got this.  They're both

5       reports that we believe Detective Pigford had in

6       his possession or had knowledge of.

7                       And then you have a question of

8       why are you excluding certain information and

9       including others?  For example, and I believe

10      it's included in the police paperwork, we know

11      that the DelJIS information that was pulled up

12      on Mr. Lum describes him as a 5'8" individual,

13      140 to 150 pounds, or something like that.  So

14      these questions are there.

15                      In addition, the victim also in

16      the police paperwork apparently told Officer

17      Pigford that the suspect left the area in a

18      Crown Victoria.  That's not in the police -- I'm

19      sorry, in the warrant affidavit and I would

20      suggest to the Court if it's likely that a

21      person visiting their aunt and then leave in a

22      car, that's something that the judicial officer

23      determining the probable cause may want to weigh

24      and determine whether or not, in fact, the

7

1    officer believes that there is probable cause

2    here.

3                 I would ask the Court to allow

4    some cross-examination on Detective Pigford on

5    this issue.  If the Court feels that it doesn't

6    rise to the level of Franks hearing, then the

7    Court can quite easily make that determination

8    after the initial examination of Detective

9    Pigford.

10                THE COURT:  Well, this hearing is

11   being held based on the papers filed by the

12   defendant pursuant to United States versus

13   Frank.  And Franks essentially holds that, or

14   the principle of Franks is that if the police

15   provided an intentional false statement or a

16   recklessly false statement in support of

17   probable cause to the issuing magistrate, that

18   Franks allows that inquiry to go on so as to

19   show that there was a lack of probable cause

20   when considering the provided probable cause

21   minus the established falsehood.

22                So typically the result is,

23   without the falsehood or the reckless

24   representation, the warrant lacks probable cause

1    and is coerced and the evidence suppressed.

2            The burden is twice on the

3    defendant under Franks.  First to make a

4    preliminary showing to get the hearing

5    scheduled.  When I reviewed the papers, just

6    going to the supplemental paper, I had a

7    statement, for instance, under -- on page two

8    subparagraph B, a warrant affidavit contains

9    intentionally misleading information, including

10   that one of the subjects involved in the

11   shooting incident stated stop hanging in front

12   of my mom's house.

13           Now, I assume that there are in

14   addition to that other false or allegations of

15   falsehoods supplied by the officers in their

16   affidavit that was the basis upon supporting

17   probable cause upon which the magistrate issued

18   a warrant.  And I -- and then -- so, I was

19   willing to schedule a Franks hearing.

20           Now, the second step for the

21   defendant is the burden is on the defendant to

22   establish by I believe a preponderance of the

23   evidence that there are falsehoods that were

24   utilized by the police to obtain -- to provide

1       probable cause to obtain the warrant.

2                   So at a Franks hearing, it's my

3       understanding the defendant puts on its proof.

4                   MR. BOSTIC:  Yes, Your Honor.

5                   THE COURT:  Now, I don't think

6       that Franks takes into account the decision

7       making of investigators.  In other words, when

8       the police go out and conduct an investigation,

9       they interviewed ten witnesses and they get

10      conflicting stories, I don't think they're

11      obligated to report their investigation when

12      applying for a warrant in the context of the

13      supporting probable cause.  I think they can

14      fashion the evidence that they believe supports

15      probable -- is probable cause to support the

16      issuance of a warrant.

17                  So I think that the defendant's

18      inquiry at a Franks hearing has to be directed

19      toward the facts averred to by the swearing

20      officer that is the -- that comprises the

21      probable cause offered to the issuing

22      magistrate.

23                  Now, it's interesting, there may

24      be a lot of information in the police reports

1    that is different than the information the

2    police used to establish probable cause, but I

3    think if it does go to showing that the facts

4    averred are false, it only becomes possibly

5    material for a trial to examine the officers

6    about on the issue of reasonable doubt.

7                So in sum, we're at a Franks

8    hearing, I have considered the papers of the

9    defendant to get the hearing scheduled.  Now

10   it's the defendant's burden to prove false facts

11   alleged as probable cause to support the

12   warrant.

13                MR. BOSTIC:  Your Honor, we would

14   ask to call Detective Pigford to the stand.

15                THE COURT:  All right.

16                MR. BOSTIC:  Thank you.

17                THE CLERK:  Please state and spell

18   your full name for the record.

19                THE WITNESS:  George Pigford,

20   G-E-O-R-G-E, Pigford, P-I-G-F-O-R-D.

21

22

23

24

11

```
 1                    GEORGE PIGFORD,

 2            the deponent herein, having first

 3            been duly sworn on oath, was

 4            examined and testified as follows:

 5                  CROSS-EXAMINATION

 6   BY MR. BOSTIC:

 7          Q.   Good afternoon.

 8                MR. BOSTIC:  May I proceed, Your

 9     Honor?

10                THE COURT:  Yes, you may.

11   BY MR. BOSTIC:

12          Q.   Good afternoon, detective.

13          A.   Good afternoon.

14          Q.   I want to turn your attention to

15     the matter of the investigation involving a

16     shooting that occurred in the vicinity of 3001

17     North Madison around June 30, 2007.  Do you

18     recall that investigation?

19          A.   Yes.

20          Q.   And do you recall make application

21     I believe it was to Judge Lopez for a search

22     warrant to be issued in connection with that?

23          A.   Yes.

24                MR. BOSTIC:  If I may approach,
```

1    Your Honor.

2                    THE COURT:  Yes.

3    BY MR. BOSTIC:

4         Q.   Officer, I show you what's been

5    marked as Defense Exhibit Number 1?

6                    MR. BOSTIC:  May I approach, Your

7    Honor.

8                    THE COURT:  Yes.  Thank you.

9    BY MR. BOSTIC:

10        Q.   Can you identify that document,

11   sir?

12        A.   Yes, sir.  This is a search

13   warrant which I authored and then swore to for

14   the address of 3001 North Madison Street.

15        Q.   Let's start with, at what time did

16   you become aware of the reported incident of a

17   shooting in the vicinity of 3001 North Madison?

18        A.   It was a little after the incident

19   occurred.  The incident occurred about a little

20   after 4:00 in the morning on June 30th.  I was

21   notified a few minutes later.

22        Q.   And did you in connection with

23   that investigation, did you go to the scene?

24        A.   Yes.

13

1          Q.    And at the scene, were you able to

2    interview anyone there concerning the shooting?

3          A.    Yes.

4          Q.    Would you state for the record who

5    you interviewed?

6          A.    I would have to check my records

7    for his name, but I did interview a witness who

8    stated he was walking with the victim at the

9    time of the incident.

10         Q.    Do you have paperwork that

11   indicates the person's name?

12              MR. WEEDE:   Your Honor, I object

13   to this.  The government's policy of not

14   disclosing witness's names in the discovery has

15   been consistent in the case, i.e., this person's

16   name has been redacted from the discovery

17   Mr. Bostic has.  I'm not sure what relevance it

18   would be to the person's name to the particular

19   hearing today.  If we could refer to this person

20   as Witness 1, I think that would be sufficient.

21              MR. BOSTIC:   I'll proceed with

22   Witness 1.

23              THE COURT:   We're specifically

24   talking about paragraph three; correct?

14

```
 1              MR. BOSTIC:  Yes, Your Honor.

 2              THE COURT:  That's the fact in

 3      support of probable cause that you're

 4      challenging where it says the witness stated

 5      that he and the victim, that would be Witness 1?

 6              MR. BOSTIC:  Yes.

 7              THE COURT:  I'm just trying to

 8      make the record clear so people understand what

 9      witness we're talking about.  So Witness 1 is

10      the witness in paragraph three.

11              THE WITNESS:  Yes, sir.

12          Q.   And Witness 1 is the individual

13      who was not shot, who was not injured?

14          A.   Correct.

15          Q.   Now, you indicated there that you

16      received information that the Witness 1 I

17      believe said stop -- said that the suspect said

18      stop hanging in front of my mother's house?

19          A.   Correct.

20          Q.   Was there any point in time that

21      you received information from Witness 1 or from

22      the victim that indicated that the person that

23      did the shooting said stop hanging in front of

24      my aunt's house?
```

1          A.    Yes.

2          Q.    And from whom did it come, Witness

3     1 or the victim?

4          A.    The statement stop hanging in

5     front of my aunt's house came from the witness.

6     The statement stop hanging in front of my mom's

7     house came from the victim.  And when I authored

8     this search warrant, I made them both the same

9     statement.  I inadvertently did that and I

10    changed the one word.

11              When I wrote this statement, when

12    I wrote this affidavit, I did so immediately

13    following interviewing the victim, and his

14    statement was fresh in my mind when this went

15    in.

16          Q.    But in preparing the warrant, you

17    had notes that you had written down concerning

18    your conversations or interviews with Witness 1

19    as well as the victim; am I right?

20          A.    Yes.

21          Q.    Would it be fair to say that you

22    would have reviewed those notes in preparing the

23    warrant?

24          A.    No.

```
 1              Q.   You just went from memory?

 2              A.   Yes.  It was a matter of a few

 3    hours between the first interview and when I

 4    authored this search warrant.

 5              Q.   Now, was it Witness 1 or the

 6    victim who indicated to you that the person that

 7    shot him was a light skinned or did the shooting

 8    was a light skinned male about 5'7", 120 pounds?

 9              A.   That was the witness.

10              Q.   And in the affidavit in paragraph

11    six, you have indicated in there that you

12    received information -- strike that.

13              Paragraph six if I can refer you

14    to Defense Exhibit Number 1, the information

15    relayed in that paragraph, from whom did you get

16    that?

17              A.   That is from the victim.

18              Q.   And did either the victim or the

19    witness tell you that the shooter was a light

20    skinned male about twenty years old, black male?

21              A.   Yes.

22              Q.   And about 5'7", 120 pounds?

23              A.   Yes.  The witness made those

24    statements to me at the scene.
```

17

```
1              Q.    Is there any reason why the

2      information regarding what the witness told you

3      was not included in the affidavit?

4              A.    No.    Because the information told

5      to me by the victim is included.

6              Q.    And let me mark for you what --

7      let me show you what's been marked as Defense

8      Exhibit Number 4.

9                    MR. BOSTIC:    If I may approach,

10     Your Honor.

11                   THE COURT:    Yes.    You may approach

12     freely.

13                   MR. BOSTIC:    Thank you.

14     BY MR. BOSTIC:

15             Q.    Do you recognize the writing on

16     Defense Exhibit Number 4?

17             A.    Yes, sir.    They are my handwritten

18     notes that I made at the scene.

19             Q.    And that was based on your

20     interview of the witness, Witness 1?

21             A.    Correct.

22             Q.    And that's where it's recorded

23     that the individual that did the shooting was

24     5'7", light skinned black male?
```

18

```
1            A.    Yes.
2            Q.    Now, with respect to the victim,
3     did you also make notes of your interview with
4     the victim?
5            A.    Yes.
6            Q.    And those notes indicate -- well,
7     let me show you what's marked as Defense Exhibit
8     Number 5.  And that consist of two pages.  Are
9     these also your handwritten notes, Detective?
10           A.    Yes.
11           Q.    Now, on page one of Defendant's
12    Exhibit Number 5, it's indicated on there that
13    the person was a black male approximately
14    twenty-five years old; is that right?
15           A.    Yes.
16           Q.    And they say something about S1
17    and mom's.  Can you read that, what does it say
18    there?
19           A.    My notes say S1 is a code that I
20    use for a suspect.  And it says that this yellow
21    building on the corner refers to 3001 North
22    Madison Street and that this is the suspect's
23    mom's house.
24           Q.    Now, with respect to some
```

19

1    information concerning height -- I'm sorry,

2    concerning the words LT, 25 BM, 25 and above

3    that LT, what does that LT refer to?

4         A.   The following word is brown, light

5    brown referring to the complex of the suspect.

6         Q.   Now, was that included in the

7    search warrant that the individual that was a

8    light skinned -- light brown skin black male?

9         A.   No, sir, just black male.

10         Q.   Now, you have the words five six,

11    five eight, and it seems as if they were

12    scratched over or written over?

13         A.   Yes, sir, I misunderstood them the

14    first time and I corrected my notes.

15         Q.   What did he say to you the first

16    time?

17         A.   I don't know.  I asked him again

18    and he gave me the description that's listed in

19    the notes which is five six to five eight, 140

20    to 150.

21         Q.   It also indicates on there that

22    hair longer, small mustache; is that right?

23         A.   Yes, sir.

24         Q.   Now, you testified earlier I

```
 1      believe that you were informed that the person
 2      left the area -- strike that.
 3                  Do you recall receiving
 4      information from either the victim or Witness
 5      Number 1 that the shooter had left the area in a
 6      vehicle?
 7             A.    Yes.
 8             Q.    From whom did you get that?
 9             A.    I received the vehicle information
10      from the victim.
11             Q.    Now, do you know any reason why
12      that was not included in the warrant affidavit?
13             A.    It didn't pertain to the warrant,
14      to the probable cause of the warrant.  Nothing
15      involving this crime was there ever a vehicle
16      mentioned.
17             Q.    Didn't you just testify that the
18      victim told you that the suspect that shot him
19      left the area in a Crown Victoria?
20             A.    No, sir.  If I did, then I
21      misspoke.  And my explanation is he stated it
22      was a new black car, it says possibly a Saab.
23      The victim never explained to me the suspect
24      ever fled anywhere, because the victim actually
```

1    fled the scene.

2              Q.    Now, did you speak with other

3    police officers that investigated the crime?

4              A.    Yes.

5              Q.    Prior to preparing your warrant

6    affidavit?

7              A.    I spoke with the initial officers

8    who had responded to the scene.

9              Q.    Did you speak with Officer

10   Cavanaugh.

11             A.    Yes.

12             Q.    And you're aware of his report

13   prepared in connection with this investigation,

14   are you not?

15             A.    Yes.

16             Q.    Detective, let me show you what's

17   marked as Defense Exhibit Number 3.  Page one,

18   it's Bates number 042, the very first page.

19             A.    Yes, sir.

20             Q.    You would agree with me that in

21   his report, also Patrolman Cavanaugh indicated

22   that suspect number one is a light skinned black

23   male approximately five seven to five nine; is

24   that correct?

22

```
 1              A.   Yes, sir, that officer did write

 2     that.

 3              Q.   And on page two of that report,

 4     Bates number 043, I think it's the third line

 5     down, typewritten line, maybe fourth, where it's

 6     stated S1 then fled the scene in a 1997 to 2001

 7     gray in color Ford Crown Victoria.  Is that

 8     correct?

 9              A.   Yes.

10              Q.   Were you aware of that at the time

11     you prepared the warrant affidavit?

12              A.   No.

13              Q.   When did you first become aware of

14     that?

15              A.   When I read this report after I

16     wrote my follow-up report to this one.

17              Q.   So it's your testimony that when

18     you spoke with Cavanaugh, it occurred after you

19     wrote the possible cause affidavit or before?

20              A.   I spoke with him initially when I

21     arrived at the scene.  He gave me a brief

22     description of what had happened and at no point

23     did he mention a fleeing vehicle.

24              Q.   Now, prior to seeking the warrant,
```

```
1    you also did a telephone check on the premises;

2    is that right?

3           A.    Yes.

4           Q.    And that's in your warrant

5    affidavit; is that right?

6           A.    Yes.

7           Q.    And I believe it's in paragraph

8    seven, you indicated you performed a reverse

9    phone number search and learned that this number

10   is also registered to a Stanley Ium; is that

11   correct?

12          A.    Yes.

13          Q.    How do you go about performing a

14   reverse telephone number search?

15               MR. WEEDE:  Your Honor, at this

16   point, I would object and I'll state my reason

17   briefly.

18               Your Honor, as Your Honor pointed

19   out the whole reason for the Franks hearing I

20   believe was based on paragraph I believe it's

21   3(b) of his motion.  I don't know where a phone

22   number is even mentioned in his motion at all.

23   I think we're far afield of what he originally

24   got the Franks hearing for and I just note my
```

24

1      objection on that basis.

2                  MR. BOSTIC:  Your Honor, maybe I

3      was not as particular as I should have been, but

4      I did reference other misstatements and I can

5      wrap up this piece of cross-examination very

6      briefly by showing the officer an exhibit which

7      I think may get us to where we need to get to.

8                  THE COURT:  All right.

9      BY MR. BOSTIC:

10                 Q.   Officer, you have Defense Exhibit

11     Number 5.  Is that right?

12                 A.   Yes.

13                 Q.   This is in your handwritten notes;

14     is that right?

15                 A.   Yes.

16                 Q.   I want you to turn to Bates number

17     049, second page of Exhibit 5.

18                 A.   Yes, sir.

19                 Q.   At the bottom of there, you have

20     on that paper you have reverse address for 3001

21     North Madison; is that right?

22                 A.   Yes, sir.

23                 Q.   And there you also have Renee

24     Paine and a telephone number; is that right?

1          A.    Yes.

2          Q.    And that's the telephone number

3    you were referring to in paragraph seven of the

4    affidavit?

5          A.    Yes.

6          Q.    And the final notation on that in

7    your handwritten notes, you again listed the

8    telephone number, same telephone number?

9          A.    Yes.

10         Q.    And the last four numbers is 7917?

11         A.    Yes.

12         Q.    And on there you indicated used by

13   Lum '03; is that correct?

14         A.    Yes.

15         Q.    Now, so is it the reverse phone

16   check that gave you some data that Lum had used

17   that number or did you get that information from

18   elsewhere?

19         A.    I initially got the phone number

20   that's registered to the address of 3001 North

21   Madison through a check which cross-references

22   addresses through telephone numbers.  It's a

23   public records check on the white pages website.

24   That check gave me the phone number that's

1    listed here.

2                When I take that phone number and

3    I use the reverse address, it brings me also to

4    a gentleman named Stanley Lum whose name I had

5    not had previously, and that's why Stanley Lum

6    was developed.

7            Q.   Is it your testimony then that

8    when you got the -- completed the reverse

9    telephone check, that indicated Mr. Lum had used

10    that number in 2003?

11           A.   That's the last time Mr. Lum had

12    used that number.

13           Q.   And would it be fair to say that

14    it's not noted in your warrant affidavit that

15    Mr. Lum had used the number in 2003; is that

16    correct?

17           A.   No, it is not noted in the

18    warrant, the date.

19                MR. BOSTIC:   I have nothing else,

20    Your Honor.

21                MR. WEEDE:   May I, Your Honor?

22                THE COURT:   Yes.

23                DIRECT EXAMINATION

24    BY MR. WEEDE:

27

1          Q.   Good afternoon, Detective Pigford.

2          A.   Good afternoon.

3          Q.   Now, I believe one of the first

4     things that the defense asked you about, let me

5     do this.

6                MR. WEEDE:   Your Honor, may I

7     approach?

8                THE COURT:   Yes.

9     BY MR. WEEDE:

10         Q.   Detective, do you have Defendant's

11    Exhibit 5 in front of you?

12         A.   Yes.

13         Q.   What is Exhibit 5?

14         A.   These are my handwritten notes of

15    an interview with the victim.

16         Q.   Now, how do you know these notes

17    are what the victim said?

18         A.   Because the top, the large block

19    at the top of the page that's redacted is the

20    victim's information.  The next thing down is

21    Room 5D which is the hospital room, that CER

22    means Christiana Emergency Room which is where I

23    interviewed the victim.

24         Q.   When did you speak to the victim?

28

1          A.   Five o'clock in the evening.

2          Q.   When did you first go on scene to

3     respond to this call?

4          A.   Five o'clock in the morning.

5          Q.   Okay.  Now, on these notes, the

6     address 3001, 3001 North Madison Street is

7     given.  Why do you have that written in your

8     notes at that particular --

9          A.   That's the address that the victim

10    told me where the suspect lives.

11         Q.   Okay.  How long was the

12    conversation you had with the victim at 5:00

13    p.m. on June 30th?

14         A.   About ten minutes.

15         Q.   Did you include every single thing

16    that the victim told you in these notes?

17         A.   No.

18         Q.   What I would like to note is you

19    have here written, let me go to the next

20    listing, it says --

21              THE COURT:  I believe you said

22    defendant, everything the defendant told you.

23         Q.   My apologies, Your Honor.

24    Everything the victim told you; is that correct?

1          A.    No, I did not.

2                MR. WEEDE:   Thank you, Your Honor.

3          Q.    You have listed in here briefly

4    touching on defenses point where it says S1,

5    could I draw your attention to the middle of the

6    page there?

7          A.    Yes.

8          Q.    Now, is that basically short form

9    for what he told you --

10         A.    Yes.

11         Q.    -- written there.

12               Could you read that into the

13   record, please?

14         A.    The S1 is a code that I would use

15   for suspect.  BM is black male, 25.  LT means

16   light brown, five six to five eight, 140 to 150

17   weight.  It says new black car, possibly Saab,

18   hair longer, small mustache.

19         Q.    Now, turning your attention to the

20   affidavit, please, that's Defense Exhibit Number

21   1, I believe.  And turning your attention to

22   paragraph seven, I'm sorry, my apologies,

23   paragraph six, do you, in fact, indicate there

24   that the description that the victim gave was

1    that the shooter was five six to five eight and

2    approximately 140 to 150 pounds?

3         A.   Yes.

4         Q.   On that piece of paper going back

5    to your notes, Defendant's Exhibit Number 5, do

6    you also indicate that this individual told you

7    that 3001 North Madison Street was the suspect's

8    mom's house?

9         A.   Yes.

10        Q.   When you spoke with the victim,

11   did the victim ever indicate anything about the

12   shooter saying that it was his aunt's house at

13   that location?

14        A.   No.

15        Q.   Who said that again?

16        A.   The witness did.

17        Q.   Did you ever record that in a

18   report?

19        A.   Yes.

20        MR. WEEDE:   Your Honor, may I

21   approach?

22        THE COURT:   Yes.

23        Q.   Approaching with what I'm going to

24   mark as Government's Exhibit 1.  Do you

1    recognize that document?

2              A.    Yes.

3              Q.    What is that document?

4              A.    It's a crime report that I wrote.

5              Q.    Now, do you recall when you

6    drafted that report?

7              A.    I don't remember the exact date

8    that I wrote the final report.

9              Q.    Let me ask you this.  Is the

10   report date listed on that report?

11             A.    Yes.

12             Q.    What's the report date?

13             A.    The report date is 7/31/07.

14             Q.    And typically in your practice as

15   an officer or as a detective, does the report

16   date typically correspond roughly with what you

17   would have written the report?

18             A.    Yes.

19             Q.    Turning your attention to the

20   second paragraph, is this where -- can you point

21   to the language where you indicate that the

22   victim said something to the effect of get away

23   from my aunt's house?

24             A.    Yes, where the witness made that

```
 1    statement.
 2              Q.   Yes.   Where the witness made that
 3    statement.
 4              Now, turning your attention to
 5    paragraph three, what do you record that the
 6    victim said there?
 7              A.   I record that he says that the
 8    suspect said get the fuck away from my mom's
 9    house.
10              Q.   And that's essentially the same as
11    you wrote in your affidavit; is that correct?
12              A.   Yes.
13              Q.   And again, I believe you explained
14    this on direct, but what was the reason why you
15    wrote mom's house in the affidavit for what the
16    witness said in paragraph three instead of
17    aunt's house as you have listed in your report?
18              A.   I made the mistake because I have
19    freshly spoken with the victim within a few
20    minutes, maybe even an hour of speaking with the
21    victim I wrote the affidavit of probable cause
22    for the search warrant and when I did it I made
23    the mistake of including the exact same
24    statement from the victim to the witness.
```

33

1           Q.    Now, do you have Defendant's

2    Exhibit 4 up there?

3           A.    Yes.

4           Q.    So the record is clear, what's

5    Defendant's Exhibit 4?

6           A.    It is a copy of my handwritten

7    notes and my sketch of the scene.

8           Q.    Okay.  And these are the notes of

9    your conversation with the witness; is that

10   right?

11          A.    Yes.

12          Q.    How do you know it's your

13   recordings of the statements of the witness as

14   opposed to the victim?

15          A.    Because the page immediately prior

16   to this is the witness's information, and this

17   was his statement given at the scene.  The

18   victim was not at the scene when I arrived, he

19   had already been transported to the hospital and

20   the only person that I spoke to was the witness.

21          Q.    Now, turning your attention to the

22   top of those notes, let me first ask you this, I

23   think you mentioned with regard to your

24   statements, the statements of the victim, did

34

```
 1     you take down every single thing that the
 2     witness said in your notes?
 3            A.   No.
 4            Q.   What I would like to turn your
 5     attention to is I believe defense asked you
 6     about you listing five seven, 120 pounds in your
 7     notes?
 8            A.   Yes.
 9            Q.   Is that something you recall the
10     witness saying to you that night?
11            A.   Yes.  Or that morning.
12            Q.   What's the two words you have
13     right below that?
14            A.   It says cannot identify D, which
15     means he cannot identify the suspect.
16            Q.   Did that factor into your
17     reasoning about whether or not to put his
18     statement into the affidavit?
19            A.   He would not be used later as
20     anyone to identify a suspect.  This is the
21     general information that he gave me of what he
22     saw.
23            Q.   But the fact that he cannot ID
24     him, the victim said he could ID him; is that
```

1    correct?

2              A.    Correct.

3              Q.    Is that in fact recorded in your

4    notes that I just introduced as Government's

5    Exhibit Number 1 -- not your notes, my

6    apologies, your report, Government's Exhibit 1?

7              A.    Yes.

8              Q.    Could you point that out for the

9    Court, please.

10             A.    In the third paragraph down it

11   says the victim also stated that before he heard

12   the shots fired, heard the suspect and the other

13   male arguing and he made the statement we

14   previously read, the victim stated he has seen

15   the suspect before and can definitely identify

16   him.

17             Q.    Did you have roughly the same

18   language listed in your affidavit that you filed

19   for the search warrant?

20             A.    Yes, roughly.

21             Q.    Can you turn your attention I

22   believe to it's Defendant's Exhibit 1.

23             A.    Yes.

24             Q.    And your attention to paragraph

1    six.  Is roughly the same statement contained in

2    there?

3         A.   Yes.

4         Q.   The last thing I would like to

5    discuss with regard to Defendant's Exhibit 4,

6    right below can't I.D., what do you have written

7    there?

8         A.   I have suspect lives at 3001 North

9    Madison.

10        Q.   Before you said that you didn't

11   look at your notes before you wrote up the

12   affidavit; is that correct?

13        A.   Correct.

14        Q.   Now, the witness saying that the

15   suspect lives at 3001 North Madison, that would

16   be something important for getting an affidavit

17   of probable cause to search 3001 North Madison;

18   is that fair to say?

19        A.   Yes.

20        Q.   Did you include that statement in

21   the warrant affidavit?

22        A.   No.

23        Q.   Why not?

24        A.   I believe that the account of what

37

1    had happened was best described me by the

2    victim.

3             Q.   But also as you said before, you

4    didn't look at your notes prior to --

5             A.   I did not.

6             Q.   Or you didn't rely on them I think

7    is what you said?

8             A.   Correct.

9             Q.   There has been a lot of discussion

10   or at least some discussion about a Crown

11   Victoria versus a Saab.  Was this a warrant for

12   an automobile, stating the obvious?

13            A.   No.

14                 MR. WEEDE:  May I have one moment,

15   Your Honor?

16                 THE COURT:  Yes.

17   BY MR. WEEDE:

18            Q.   With regard to I believe it's

19   Defense Exhibit 3, can you turn your attention

20   to that, please.

21                 MR. BOSTIC:  I'm sorry, counsel,

22   what did you say?

23                 MR. WEEDE:  Defendant's Exhibit 3.

24                 MR. BOSTIC:  Thanks.

38

```
1    BY MR. WEEDE:

2              Q.    Do you have that in front of you?

3              A.    Yes.

4              Q.    What is that document?

5              A.    This is a police report written by

6    the responding officer, Cavanaugh.

7              Q.    Now, I believe you mentioned --

8    well, for the Court, you responded at about 5:00

9    a.m.; is that correct?

10             A.    Yes.

11             Q.    You did some investigation after

12   that, I suppose?

13             A.    Correct.

14             Q.    At what time did you interview the

15   victim?

16             A.    Five o'clock in the evening.

17             Q.    Would you have gotten the

18   affidavit after --

19             A.    Yes.

20             Q.    Other than being at the scene, was

21   Cavanaugh involved with any of your other

22   investigation?

23             A.    No.

24             Q.    Did you, in fact, tell him that
```

39

```
 1    you were getting a search warrant for 3001 North

 2    Madison?

 3              A.    No.

 4              Q.    Is there anything in his report

 5    indicative that there is a search warrant for

 6    that location?

 7              A.    No.

 8              Q.    Detective Pigford, what's your

 9    position at Wilmington?

10              A.    I am assigned to the Criminal

11    Investigation Division as a detective.

12              Q.    And basically describe your duties

13    there?

14              A.    We're tasked with investigating

15    crimes of a serious nature, robberies, rapes,

16    homicides and various drug offenses that rise to

17    a level of a more serious nature.

18              Q.    Now, what, if you know, is

19    Cavanaugh's position at Wilmington?

20              A.    He is a patrol officer.

21              Q.    So how does that in any way differ

22    from being a detective, if you can explain to

23    the Court?

24              A.    The patrol officers generally have
```

40

1    less training and experience in investigating

2    crimes, his job is to respond to a call for

3    service, try to stabilize the situation and wait

4    for an investigator or whoever else is deemed

5    necessary to arrive.

6                MR. WEEDE:  Your Honor, that's all

7    I have.

8                THE COURT:  All right.

9                Mr. Bostic.

10                MR. BOSTIC:  I guess I have one

11    question, briefly

12                    RECROSS-EXAMINATION

13    BY MR. BOSTIC:

14           Q.    Maybe two.

15                Detective, I would assume that it

16    was Patrolman Cavanaugh who got to the scene

17    first; am I correct?

18           A.    Yes.

19           Q.    As part of your duties as a

20    detective, you debrief him to get the

21    information that you had obtained prior to your

22    getting there; is that correct?

23           A.    Yes.

24                MR. BOSTIC:  I have nothing else,

41

```
1    Your Honor.
2                    THE COURT:  Thank you, detective.
3    You may step down.
4                    Mr. Bostic, are they your
5    exhibits.
6                    MR. BOSTIC:  Yes, Your Honor.  We
7    move them into the record and rest on this part
8    of the motion.
9                    THE COURT:  No objection to the
10   exhibits?
11                   MR. WEEDE:  No objection, Your
12   Honor.
13                   THE COURT:  All right.  Mr. Weeks,
14   do you have any witnesses?
15                   MR. WEEDE:  No.
16                   THE COURT:  Okay.  Mr. Bostic, did
17   you want to submit a post hearing letter?
18                   MR. BOSTIC:  Your Honor, yes, we
19   will.  Thank you.
20                   THE COURT:  Okay.  And Mr. Weede,
21   you'll have a couple of days to respond to it.
22                   MR. WEEDE:  That's fine, Your
23   Honor.
24                   THE COURT:  We'll try to get all
```

1    that done in the next ten days to two weeks and

2    then we'll get you a decision.

3              MR. BOSTIC:  I guess I just want

4    to say one thing.  There were also -- there was

5    a motion to suppress a statement as well that

6    was part of the initial motion.  I don't know

7    whether we're going to do that at another time.

8    I would tell the Court that perhaps it's

9    something that Mr. Weede and I can resolve

10   without a hearing, but the motion was part of

11   the initial motion, so I didn't want the Court

12   not to --

13             MR. WEEDE:  Your Honor, we're

14   prepared to address it today if you would like,

15   whatever is fine for the Court.  If you're

16   wanting to address the Franks hearing first and

17   see if another hearing is warranted, I would be

18   happy to do that.  We have Detective Pigford

19   here, he's the only person I need for that

20   motion.

21             MR. BOSTIC:  You know, it might

22   make sense if we just finish it up right now.

23             THE COURT:  Sure.  I don't want to

24   have another hearing.  So if the defendant

43

1    continues to challenge the taking of that

2    statement, we can put the detective back on the

3    stand and finish up.

4              MR. BOSTIC:  Give me one moment,

5    Your Honor.

6              THE COURT:  Sure.

7              MR. BOSTIC:  Your Honor, I

8    discussed with Mr. Lum the fact that we had

9    filed the motion with regard to the statement,

10   suppressing the statement based on whether or

11   not he was properly Mirandized and fully

12   understood the Miranda warnings and made a

13   voluntary statement.

14             Further consultation with Mr. Lum

15   at counsel table, Mr. Lum indicated to me that

16   he will withdraw on that motion with respect to

17   his statement.

18             THE COURT:  All right.  The motion

19   will be withdrawn.

20             MR. WEEDE:  Your Honor, briefly

21   just to address for the record, my reading of

22   the initial motion is it challenges probable

23   cause for the search, it challenges the scope of

24   the search and it challenges the statement.

1         My view on it of course with

2    regard to the actual probable cause to the

3    search is that's a four corners argument we can

4    handle in the briefs.  With regard to the scope

5    of the search if he's still challenging that, I

6    would have to put on testimony.

7              THE COURT:  No, I think as I

8    understood it from our first get together that

9    that was all directed toward the Frank issue,

10   Franks issue, so I think the only thing

11   Mr. Bostic has correctly pointed out was the

12   statement which I guess I assumed had been

13   withdrawn as we were focusing on Franks and now

14   it has been withdrawn, so it would only be the

15   scope of the search if there was a failure of

16   the probable cause, I think.

17             MR. BOSTIC:  Your Honor, Mr. Weede

18   is right to the extent that the Court still has

19   to consider whether the items recovered went

20   beyond the scope.  And I think the warrant

21   itself outlines what was to be searched and

22   seized.  I don't know that we need -- I don't

23   know if it's necessary to hold additional

24   testimony on the issue.

45

1          The question is we're not

2     contesting that the officers did not see the

3     items that they saw during the search for

4     Mr. Lum and during the search for the 40 caliber

5     weapon.

6          The question is whether or not the

7     case law would support the seizure of, for

8     example, the controlled substance where the

9     scope of the warrant was limited to a gun,

10    pictures of the male resident, and the body of

11    Mr. Lum for a photograph.  And I think that

12    doesn't necessitate testimony.

13          MR. WEEDE:  Very briefly, Your

14    Honor.  I believe the case law is clear that if

15    Detective Pigford as he was pursuant to a search

16    warrant searching a house and in that area

17    legally and is looking for a gun, ammunition and

18    photographs of a defendant, which he spots

19    something else which is in plain view and it's

20    clearly contraband, he can seize that.

21          THE COURT:  I think what

22    Mr. Bostic is raising, and I'll leave this to

23    your letters, is if you're searching for Mr. Lum

24    and you find a packet of cocaine in the medicine

46

1    cabinet, you weren't supposed to be in the

2    medicine cabinet even if you had a house search

3    warrant.

4              I don't know, do you think you can

5    look in a medicine cabinet when the warrant only

6    allows you to search for the body of Mr. Lum?

7              MR. WEEDE:  No, Your Honor.

8              THE COURT:  Right.  Now, if you're

9    in the house and laying on the dining room table

10   is a kilo, that's in plain view and that can be

11   seized.

12             But I'll leave it to you to

13   respond to Mr. Bostic's argument if he maintains

14   scope that the execution of the warrant by the

15   officers was within the parameters of the

16   authorization which were weapon, body, and there

17   is a third thing.

18             MR. BOSTIC:  Photographs.

19             THE COURT:  What was it?

20             MR. BOSTIC:  Photographs.

21             THE COURT:  Photographs.

22             MR. WEEDE:  It's also ammunition,

23   Your Honor.

24             THE COURT:  Ammunition.  But you

47

1    can argue that in a letter.  I don't think this

2    is a medicine cabinet case.

3                    MR. WEEDE:  That's correct, Your

4    Honor.

5                    THE COURT:  Okay.  All right.

6    We'll look for the letters and we'll be in

7    recess.

8                    (Court recessed at 2:49 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

48

```
1    State of Delaware      )
                            )
2    New Castle County      )

3

4

5                CERTIFICATE OF REPORTER

6

7         I, Dale C. Hawkins, Registered Merit
     Reporter and Notary Public, do hereby certify that
8    the foregoing record is a true and accurate
     transcript of my stenographic notes taken on April
9    18, 2008, in the above-captioned matter.

10        IN WITNESS WHEREOF, I have hereunto set my
     hand and seal this 23rd day of April, 2008, at
11   Wilmington.

12

13   _____
                  Dale C. Hawkins, RMR

14

15

16

17

18

19

20

21

22

23

24
```

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697   FAX (302) 658-8418